IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICAH JAMES BUTCHER, | ) | CASE NO.  1:20-CV-01230-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Micah Butcher ("Plaintiff" or "Butcher"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

In August 2017, Butcher filed applications for POD, DIB, and SSI, alleging a disability onset date of August 24, 2017 and claiming he was disabled due to bipolar disorder, ADHD, autism, and anger and

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

depression.  (Transcript ("Tr.") 10, 58.)  The applications were denied initially and upon reconsideration, and Butcher requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 10.)

On January 17, 2019, an ALJ held a hearing, during which Butcher, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 11, 2019, the ALJ issued a written decision finding Butcher was not disabled.  (*Id.* at 10-20.)  The ALJ's decision became final on April 8, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On June 5, 2020, Butcher filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16-18.)  Butcher asserts the following assignments of error:

(1)    The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter, did not find that Plaintiff satisfied the criteria of Listing 12.04, and found the opinion of the treating psychiatrist not persuasive.

(2)    The ALJ committed harmful error in his determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

(3)    The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 16 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Butcher was born in January 1989 and was 30 years-old at the time of his administrative hearing (Tr. 10, 18), making him a "younger" person under Social Security regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).  He has at least a high school education and is able to communicate in English.  (Tr. 18.)  He has past relevant work as an assembler and a retail attendant.  (*Id.*)

**B.     Medical Evidence[2]**

Butcher has seen Samer Alamir, M.D., for mental health treatment dating back to at least June 2012.  (Tr. 327.)  Butcher's diagnoses included bipolar disorder, in full remission, most recent episode manic, ADHD, and Asperger's syndrome.  (*Id.*)

On July 1, 2016, Butcher was admitted to Windsor-Laurelwood Center for Behavioral Medicine after a week of what Butcher believed to be manic symptoms over the past month followed by depression and suicidal thoughts in the past week.  (Tr. 404.)  He reported having recently begun smoking marijuana. (*Id.*)  Butcher, who had a history of bipolar disorder, complained of "severe mood dysregulation, irritability, depression, insomnia, acute anxiety, difficulty concentrating, [and] frequent thoughts of suicide." (*Id.*)  At admission, Butcher appeared withdrawn and irritable, although he was cooperative, and was easily agitated and irritable.  (*Id.*)  Peter Corpus, M.D., found Butcher's judgment and insight impaired.  (*Id.*)  At the beginning of his inpatient treatment, Butcher was impulsive, "very anxious and hypomanic" with intermittent sleep, fair appetite, blunted affect, and poor impulse control.  (*Id.* at 405.) Butcher's high levels of anxiety persisted, and he had intermittent thoughts of suicide.  (*Id.*)  By July 5, 2016, treatment providers found Butcher "mostly calm and cooperative" with "mildly pressured speech," improved mood, slightly tangential thought processes, no suicidal or homicidal ideation, and improved judgment and insight.  (*Id.*)  Butcher reported feeling safe to go home on July 6, 2016.  (*Id.*)  At discharge, Butcher was calm, pleasant, and cooperative and demonstrated good eye contact, normal speech, improved mood, linear thought processes, and intact judgment and insight.  (*Id.*)

On July 7, 2016, Butcher saw Dr. Alamir for follow up.  (*Id.* at 308.)  Butcher reported being inconsistent with his medications and feeling down and depressed, as well as trouble at work with another coworker after he called him a "'retard.'"  (*Id.*)  He felt worthless and questioned his own safety and was

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

in the hospital for five days.  (*Id.*)  Butcher reported depressive and sad symptoms, as well as crying spells.  (*Id.*)  On examination, Dr. Alamir found Butcher friendly, irritable, distracted, communicative, casually groomed, overweight, and anxious.  (*Id.*)  Butcher demonstrated normal speech, moderate depression, sad demeanor, depressed mood, intact associations, logical thinking, appropriate thought content, fair insight and judgment, anxiety, and a short attention span.  (*Id.*)  Dr. Alamir noted Butcher was emotional and easily upset.  (*Id.*)  Dr. Alamir discontinued Butcher's Wellbutrin.  (*Id.*)  By July 11, 2016, Butcher reported feeling back to normal and ready to return to work.  (*Id.* at 307.)

Butcher continued to see Dr. Alamir throughout 2016 and into 2017.  (*Id.* at 304-06.)

On May 15, 2017, Butcher saw Dr. Alamir for follow up and reported doing well.  (*Id.* at 303.)  He denied anxiety and mood disturbances and told Dr. Alamir he had been getting along with others and his mood was stable.  (*Id.*)  On examination, Dr. Alamir found Butcher had a euthymic mood and no signs of depression or manic process.  (*Id.*)  Butcher presented as relaxed, attentive, communicative, well-groomed, well-dressed, normal speech, intact associations, generally logical thinking, appropriate thought content, and intact judgment and insight.  (*Id.*)

On July 21, 2017, Butcher saw Nayarana Dasari, M.D., for follow up regarding his ADHD.  (*Id.* at 330.)  Butcher's diagnoses included bipolar I disorder, ADHD, vitamin D deficiency, and chronic GERD. (*Id.*)  Earlier treatment notes also included a diagnosis of autism.  (*Id.* at 334.)

On July 31, 2017, Butcher saw Dr. Alamir for follow up.  (*Id.* at 302.)  Butcher reported increased depression, difficulty concentrating and completing tasks, lack of interest in things he used to enjoy, lack of focus, and lack of concentration.  (*Id.*)  Butcher told Dr. Alamir his boss commented that he had not been good for three weeks and he could tell Butcher was more depressed.  (*Id.*)  Butcher described feeling like he had not had an actual thought and feeling like his brain was shut off.  (*Id.*)  Butcher reported some irritability and anger towards his sister, although he was not sure why.  (*Id.*)  Butcher told Dr. Alamir he

4

felt like people were intentionally attacking him and that he was misinterpreting things people said to him. (*Id.*)  Dr. Alamir noted Butcher expressed some paranoid thoughts.  (*Id.*)  Butcher stated he felt his mood was unstable and he wanted to see Dr. Alamir more often.  (*Id.*)  On examination, Dr. Alamir found Butcher was flat, sad looking, attentive, communicative, casually groomed, overweight, and unhappy. (*Id.*) Butcher demonstrated normal speech, moderate signs of depression, sad demeanor, depressed mood, intact and logical associations, and fair judgment and insight.  (*Id.*)  Dr. Alamir found no signs of anxiety, hyperactivity, or attentional difficulties.  (*Id.*)

On August 7, 2017, Butcher saw Dr. Alamir for follow up.  (*Id.* at 301.)  Butcher reported doing much better after starting Lexapro a week earlier.  (*Id.*)  Butcher noticed a difference in his mood and an improvement in his depression.  (*Id.*)  He reported feeling more stable, being more interactive and engaging with others, and caring for himself better.  (*Id.*)  Butcher told Dr. Alamir he had started playing the guitar more and was enjoying it.  (*Id.*)  He reported his crying spells had improved, as had his concentration and motivation.  (*Id.*)  His appetite was better, he continued to exercise, and his sleep was good.  (*Id.*)  Although Butcher had not yet returned to work, he felt ready to go back and wanted to start working again.  (*Id.*)  On examination, Dr. Alamir found Butcher had a euthymic mood, no signs of depression or manic process, with normal speech and no suicidal ideation.  (*Id.*)  Butcher presented as relaxed, attentive, communicative, well-dressed, and well-groomed.  (*Id.*)  He demonstrated intact associations, logical thinking, and appropriate thought content.  (*Id.*)  Butcher exhibited no signs of anxiety, attentional difficulties, or hyperactivity.  (*Id.*)  Dr. Alamir noted Butcher's insight and social judgment appeared intact.  (*Id.*)

On August 29, 2017, Butcher saw Dr. Alamir for an "urgent appointment."  (*Id.* at 300.)  Butcher reported his sister attacked him and he punched her back, then the police were called, and he was taken to jail for a day.  (*Id.*)  Even though his sister did not want to press charges, the state charged him anyway.

5

(*Id.*)  Butcher's wife believed he was a little manic because he did not receive his medications in jail, and he had drunk 10-12 cups of coffee before the incident with his sister.  (*Id.*)  Butcher had taken his medications the day before his appointment and was now calmer and feeling better.  (*Id.*)  Butcher reported feeling depressed about the situation.  (*Id.*)  On examination, Dr. Alamir found Butcher friendly, calm, attentive, communicative, casually groomed, overweight, and unhappy.  (*Id.*)  Butcher demonstrated normal speech.  (*Id.*)  Butcher showed signs of mild depression and mild anxiety, a sad facial expression, and a depressed mood.  (*Id.*)  Dr. Alamir found Butcher's affect to be appropriate, full range, and congruent with his mood.  (*Id.*)  Butcher demonstrated intact and logical associations and denied suicidal ideation.  (*Id.*)  Dr. Alamir determined Butcher's insight and judgment seemed fair.  (*Id.*)  Dr. Alamir noted there were no signs of attentional difficulties.  (*Id.*)

On October 10, 2017, Butcher completed a Function Report.  (*Id.* at 248-55.)  Butcher reported his bipolar disorder made it hard for him to get along with others, especially coworkers, and he got agitated easily with supervisors.  (*Id.* at 248.)  Butcher described a typical day as waking up, feeding his daughter, letting out his dogs, having breakfast, watching TV, taking his dogs on a walk if his wife was home, putting his daughter down for her nap, eating lunch, waking up his daughter, feeding her dinner, and putting her to bed.  (*Id.* at 249.)  His wife helped care for their daughter and pets.  (*Id.*)  Butcher reported needing reminders to shower.  (*Id.*)  Butcher prepared healthy, nutritious meals, did laundry, cleaned, and did yard work, although he was not always motivated to do those things and needed reminders.  (*Id.* at 250.)  He drove a car and went grocery shopping once to three times a month.  (*Id.* at 251.)  He paid bills, counted change, handled a savings account, and used a checkbook, although he needed supervision because he did not spend money wisely otherwise.  (*Id.* at 251-52.)  Butcher reported he did not finish what he started, he did not get along very well with authority figures, and he had been fired for his attitude with employers and peers.  (*Id.* at 253-54.)  He hated change and did not handle stress well.  (*Id.* at 254.)

Butcher also received mental health treatment at the Center for Effective Living. (*Id.* at 401.) On October 18, 2017, Butcher reported to treatment providers at the Center for Effective Living that he had been less angry, but a manic episode had started that day with flight of ideas, an inability to sit, and rapid speech. (*Id.*)

On October 30, 2017, Butcher saw Dr. Alamir and reported feeling more depressed and argumentative. (*Id.* at 356.) While Butcher was compliant with his medications, he did not always take them at the same time; his wife felt he did better when he was regular with his medication. (*Id.*) Butcher reported he was not working and was back on food stamps, as well as trying to get back on Social Security. (*Id.*) Butcher told Dr. Alamir he was having trouble following work directions, which made it harder to keep his job. (*Id.*) On examination, Dr. Alamir found Butcher friendly, irritable, distracted, communicative, casually groomed, overweight, and unhappy. (*Id.*) Butcher demonstrated normal speech, mild depression, sad demeanor, depressed mood, constricted affect, intact and logical associations, logical thinking, appropriate thought content, fair insight and judgment, anxiety, and a short attention span. (*Id.*)

On November 17, 2017, Dr. Alamir completed a Mental Impairment Questionnaire. (*Id.* at 827-28.) Dr. Alamir wrote the following as the clinical findings supporting the severity of Butcher's mental impairments and symptoms: "Patient struggles with depression, focusing, and gets overwhelmed very easily." (*Id.*) Dr. Alamir opined Butcher would be unable to meet competitive standards in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding and remembering very short and simple instructions; understanding and remembering detailed instructions;

accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  (*Id.* at 827-28.)  Dr. Alamir wrote that Butcher was "unable to work" and he would be off-task for eight hours of an eight-hour workday.  (*Id.* at 828.)

On November 30, 2017, Butcher saw Dr. Alamir for follow up.  (*Id.* at 355.)  Butcher reported feeling the same and denied any major problems.  (*Id.*)  While he felt his depression was a little better, he was not back to normal yet.  (*Id.*)  On examination, Dr. Alamir found Butcher showed no serious mental status abnormalities, with unremarkable appearance, dress, and grooming.  (*Id.*)  Butcher demonstrated intact associations, "basically logical" thinking, appropriate thought content, intact memory, normal attention span, and intact judgment and insight.  (*Id.*)

On December 12, 2017, Butcher reported to treatment providers at the Center for Effective Living that he still could not work.  (*Id.* at 396.)

On February 15, 2018, Butcher saw Dr. Alamir for follow up.  (*Id.* at 416.)  Butcher reported being argumentative but denied his anger being an issue.  (*Id.*)  Butcher told Dr. Alamir his depression was mild and not as bad as when he had called before.  (*Id.*)  Butcher reported he was applying for work, although he had been unsuccessful so far.  (*Id.*)  On examination, Dr. Alamir found Butcher showed no serious mental status abnormalities, with unremarkable appearance, dress, and grooming.  (*Id.*)  Butcher did not exhibit depression or elevated mood.  (*Id.*)  Butcher demonstrated intact associations, "basically logical" thinking, appropriate thought content, intact memory, normal attention span, and intact judgment and insight.  (*Id.*)

Just five days later, Butcher was admitted to Elyria Medical Center for treatment of his bipolar disorder, current episode depressed, severe.  (*Id.* at 470.)  Butcher reported feeling more depressed and

having suicidal ideation with a plan to overdose.  (*Id.* at 478.)  Butcher told treatment providers he had recently crashed his wife's car in an accident.  (*Id.*)  Butcher reported being "largely compliant" with his medications.  (*Id.*)  On admission, Butcher demonstrated soft speech, depressed mood and affect, tangential thoughts, fair concentration, and limited to fair insight and judgment.  (*Id.* at 480.)  Butcher was discharged on February 23, 2018.  (*Id.* at 470.)  At the time of discharge, Butcher was social with others and reported a good meeting with his family.  (*Id.* at 478.)  At discharge, Butcher demonstrated normal speech, good eye contact, cooperative behavior, less depressed mood, brighter affect, future-oriented thoughts, and intact concentration, memory, judgment, and insight.  (*Id.*)

On May 3, 2018, Butcher reported to treatment providers at the Center for Effective Living that he was doing more around the house.  (*Id.* at 507.)

On May 10, 2018, Butcher again went to Elyria Medical Center, this time in a manic phase, with thoughts of harming himself.  (*Id.* at 425.)  Butcher reported his suicidal thoughts began suddenly about four days earlier.  (*Id.* at 428.)  Butcher told treatment providers his manic episode was triggered by his sister, who had abused him as a child, contacting him the Sunday before.  (*Id.*)  Butcher also reported punching a dent in his truck earlier that week.  (*Id.*)  On initial examination, Butcher denied depression and poor impulse control, and treatment providers found him alert and cooperative, with an appropriate mood and rational, coherent, and organized thought process.  (*Id.* at 426.)  A little bit later on examination, treatment providers found Butcher had a sad, depressed mood, intact memory, and previous suicidal ideation but no plan.  (*Id.* at 428.)  On May 11, 2018, treatment providers transferred Butcher to Highland Springs as specialty care was unavailable at Elyria Medical Center.  (*Id.* at 435.)  On the Chief Complaint/Justification for Admission Form, treatment providers noted Butcher had an appropriate mood, coherent thought processes, and good memory, insight, and judgment.  (*Id.* at 442.)

Butcher remained hospitalized at Highland Springs from May 11 to May 31, 2018.  (*Id.* at 522.)
On admission, Butcher presented "as highly intrusive and labile." (*Id.*)  Treatment providers noted he
would start crying for no apparent reason and would become "highly irritated." (*Id.*)  Butcher also
demonstrated grandiose thinking and a scattered thought process, and he was hyperverbal.  (*Id.*)
Treatment providers noted Butcher "continued to have difficulty with peer interactions, getting into
frequent arguments and picking fights with others." (*Id.*)  Butcher continued to be labile with racing
thoughts and poor attention.  (*Id.*)  Even on an increased dose of Abilify, Butcher remained intrusive,
impulsive, inappropriate, and unable to sleep.  (*Id.*)  Treatment providers changed Butcher's medication
again, but he still did not appear to respond to them "as he remained hyperactive, unable to sleep,
requiring much redirection due to loose associations," as well as remaining labile, becoming tearful and
irritable easily.  (*Id.*)  After additional medication changes, Butcher "remained expansive and grandiose
with erratic behavior." (*Id.*)  After further medication adjustment, Butcher "appeared to slow down" and
was able to focus better, his sleep improved, he was less tangential, and "was no longer expressing
grandiose delusions." (*Id.* at 523.)  Butcher also was less labile in terms of his mood.  (*Id.*)  At discharge,
treatment providers found Butcher calm, cooperative, and well-groomed, with rapid speech, euthymic
mood, full affect, linear thought process, and improved insight and judgment.  (*Id.*)

Group therapy notes from Butcher's stay at Highland Springs noted continued difficulties staying
on task and concentrating, requiring frequent redirection from staff, which was not always successful.  (*Id.*
at 545-610.)  While at times he participated well and was supportive of his peers, at other times he was
interruptive and intrusive.  (*Id.*)  On May 21, 2018, Butcher told a treatment provider that other patients
said he was controlling in group therapy and they did not want him to come.  (*Id.* at 575.)

On June 5, 2018, Butcher reported to treatment providers at the Center for Effective Living that he
felt "so much better." (*Id.* at 506.)  Treatment providers noted grandiosity.  (*Id.*)

10

After discharge from his inpatient stay at Highland Springs, Butcher participated in the Highland Springs partial hospitalization program from June 7 to June 27, 2018.  (*Id.* at 624-26.)  Butcher spent five to six hours a day in psychotherapy groups, recreational therapy, and educational groups.  (*Id.* at 624.)  Treatment providers noted that while Butcher was "still mildly hyperverbal and impulsive," Butcher did not feel that increased medication was necessary at that time.  (*Id.*)  Butcher demonstrated an improvement in thought processes, thought content, and behavior.  (*Id.*)  However, Butcher wanted to continue learning coping skills through the Intensive Outpatient Program at Highland Springs.  (*Id.*)  At discharge from the partial hospitalization program, treatment providers found Butcher calm, cooperative, and well-groomed, with mildly pressured and hyperverbal speech, euthymic affect, goal-oriented thought process, intact cognition, and fair insight and judgment.  (*Id.* at 625.)

Even during his time in the partial hospitalization program, treatment providers noted Butcher had a hard time staying on task, he appeared manic and "extremely hyperactive" at times, he had poor impulse control, he continued to be hyperverbal and interrupted others, he was intrusive and made inappropriate comments, and needed to be redirected several times by staff.  (*Id.* at 638, 641-44, 646, 648-50, 652, 655-56, 660.)  By June 18, 2018, Butcher appeared more focused and less manic, and he was progressing in his treatment.  (*Id.* at 669-74.)  However, by June 20, 2018, treatment providers again noted inappropriate comments, hyperverbal speech, and difficulty focusing.  (*Id.* at 678-83.)

Butcher also continued to treat at the Center for Effective Living during his time in the partial hospitalization program.  (*Id.* at 505.)  On June 19, 2018, Butcher reported "<u>severe</u>" anger at his sister after she called their parents and yelled about him, and then wrote on Facebook that she hoped his daughter got molested.  (*Id.*) (emphasis in original).  Treatment providers noted flight of ideas, grandiosity, and anger.  (*Id.*)  Butcher's goals consisted of taking his medications daily and completing the partial hospitalization program.  (*Id.*)

11

After discharge from the partial hospitalization program, Butcher participated in the Intensive Outpatient Program at Highland Springs from July 9 through August 10, 2018.  (*Id.* at 721.)  Treatment providers noted in the IOP Discharge Summary that Butcher "appeared to struggle at times with impulsivity and boundaries, but was redirectable by clinician."  (*Id.*)

On August 1, 2018, Butcher reported to treatment providers at the Center for Effective Living that he was sleeping too much and had a hard time staying busy.  (*Id.* at 500.)  However, he said he had been working around the house and reading more.  (*Id.*)

On August 6, 2018, Butcher notified Highland Springs that he would not be returning to the IOP as he no longer had transportation.  (*Id.* at 721.)  On August 10, 2018, Butcher was administratively discharged from the IOP.  (*Id.*)

On September 4, 2018, Butcher saw Babu Eapen, M.D., for sleep problems.  (*Id.* at 787.)  Dr. Eapen noted Butcher had an appropriate affect and demeanor.  (*Id.* at 788.)

On October 2, 2018, Butcher saw treatment providers at the Center for Effective Living and reported he felt much better since getting a CPAP machine.  (*Id.* at 499.)  Butcher relayed having more energy, a better mood, and less depression and anger.  (*Id.*)

On October 12, 2018, Butcher's wife completed a Function Report.  (*Id.* at 274-81.)  She reported Butcher was unable to stay on task without being reminded, he got distracted very easily, he took constructive criticism too personally, he was easily offended, and he did not do well with authority figures, sometimes yelling at them if he got angry.  (*Id.* at 274.)  On the days she worked, Butcher took care of their daughter, including feeding and changing her, fed and let out the dogs, and made dinner.  (*Id.* at 275.)  On the days she did not work, Butcher sat and watched TV while she took care of their daughter and their pets.  (*Id.*)  She reported Butcher sometimes did not shower for three to four days, and she had to remind him to shower and brush his teeth.  (*Id.* at 275-76.)  She needed to remind Butcher to take his

medications, as even though he had reminders on his phone he would sometimes dismiss them and forget to take them.  (*Id.* at 276.)  She reported Butcher could clean, do laundry and yard work, take out the trash, clean up after their pets, and shop in stores two to three times a month.  (*Id.* at 276-77.)  She stated Butcher could not handle a saving account or use a checkbook, because if he had access to the money he would spend it on unnecessary things.  (*Id.* at 277.)  She reported Butcher had overdrafted the account before.  (*Id.*)  He visited her parents at their house weekly and went to church weekly.  (*Id.* at 278.)  She reported Butcher could pay attention for five to ten minutes, he did not follow written instructions, he did not follow spoken instructions well, he did not handle stress or changes in his routine well, he was very argumentative, and he thought provoking an argument with people was fun.  (*Id.* at 279-80.)

## C.  State Agency Reports

On October 29, 2017, Deryck Richardson, Ph.D., opined that Butcher had no limitations in his abilities to understand, remember, or apply information and concentrate, persist, or maintain pace, but had moderate limitations in his abilities to interact with others and adapt or manage himself.  (*Id.* at 62, 72.)  Dr. Richardson further opined Butcher was moderately limited in his abilities to: interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (*Id.* at 64-65, 74-75.)  Dr. Richardson determined Butcher was "[l]ikely to have some trouble w/ co-workers or supervisors," but opined Butcher could sustain superficial contact with others.  (*Id.* at 64, 75.)  Dr. Richardson further determined Butcher would "likely have increased symptomology if stressed from work," and limited Butcher to simple or repetitive work environments.  (*Id.* at 65, 75.)  Dr. Richardson further opined

13

Butcher could adapt to minor changes, but major changes would need to be explained in advance and not occur on a frequent basis.  (*Id.*)

On December 19, 2017, Courtney Zeune, Psy.D., opined that Butcher had no limitations in his ability to understand, remember, or apply information, but had moderate limitations in his abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 86, 98.)  Dr. Zeune further opined that Butcher had moderate limitations in his abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.* at 88-89, 100.)  Dr. Zeune determined Butcher could perform tasks in a work setting that did not require close, sustained attention to detail.  (*Id.* at 88, 100.)  Dr. Zeune affirmed Dr. Richardson's findings with respect to Butcher's abilities to interact with others and handle changes in the work environment.  (*Id.* at 89, 101.)

## D.    Hearing Testimony

During the January 17, 2019 hearing, Butcher testified to the following:

- He had seen Dr. Alamir since at least 2011.  (*Id.* at 38.)  He had been seeing him every three months.  (*Id.*)  He stopped seeing Dr. Alamir because he felt he was not giving him the best medical treatment and Dr. Alamir was no longer taking his insurance.  (*Id.*)  He was now treating at the Center for Effective Living.  (*Id.*)  The most important reason he stopped seeing Dr. Alamir was that he was not treating him appropriately.  (*Id.* at 38-39.)  He saw Nurse Horrigan once and got the right medications that he needed.  (*Id.* at 39.)  He met Nurse Horrigan during his hospitalization at Elyria Medical.  (*Id.*)  His wife was not happy with Dr. Alamir.  (*Id.*)  Dr. Alamir was tied to his computer, not very personal, and he was not easy to get a hold of when Butcher had a manic episode.  (*Id.* at 40.)

- There were three hospitalizations in the record.  (*Id.*)  The first one was at Windsor-Laurelwood in 2016.  (*Id.*)  That was the last time he smoked marijuana.  (*Id.*)  He was "super depressed" and felt like he was going to go to the hospital, so he wanted to "have some fun" before he went.  (*Id.*)  He has not used illegal drugs or improperly used prescribed medication since.  (*Id.*)  He is six years sober from alcohol.  (*Id.*)  He sees a counselor at the Center for Effective Living in addition to seeing Nurse Horrigan.  (*Id.*)  He sees his counselor at least once a month.  (*Id.* at 41.)

- His last job was as an assembler at Acorn Technology.  (*Id.* at 41.)  Around March 2017, procedures began changing every day and it was very hectic for him and caused

him to have a setback.  (*Id.* at 43.)  The quality of his work went down, things got shipped out wrong, he was getting written up more than ever before, and he got sent home for a week without pay because he had a meltdown at work.  (*Id.*)  He was "hysterically crying" to his boss saying he did not know what anyone wanted from him, and nothing was ever good enough.  (*Id.*)  He was almost to the point where he was going to mention suicide.  (*Id.*)  He saw a therapist after that and started taking an antidepressant.  (*Id.*)  When he returned to work three weeks later, he was fired.  (*Id.*)  He has not worked since.  (*Id.* at 44.)

- A week after he lost his job, he got into a fight with his sister and was sent to jail.  (*Id.*)  His sister pressed charges, which were dismissed in December 2017.  (*Id.*)  Around the first of the year, he got into an accident and totaled his wife's car.  (*Id.*)

- He was admitted to the hospital for three days in February 2018.  (*Id.*)  His sister contacted him on Facebook saying she hoped his daughter was molested like he was, and he got so upset that he was admitted again in May 2018.  (*Id.* at 44-45.)

- He cannot work because he cannot handle criticism very well, and when he is criticized, he gets agitated and will "blow up."  (*Id.* at 45.)  He cannot handle change well; it takes him a few weeks to get used to a change.  (*Id.*)  He worries so much that he will get things wrong that it sets him off.  (*Id.*)  He has a hard time working with other people because he will misinterpret what they say.  (*Id.*)  When he is manic, there is a voice inside his head that tells him to react a certain way, and he will "blow up" even when he should not do so and will end up getting fired.  (*Id.*)

- He lost his job at Wal-Mart because he was written up for low productivity because he took too long to do his tasks, and then he got so worried that he was going to mess up even more that he yelled at his boss.  (*Id.* at 46.)  He also got caught on his phone too many times and was out too many times a month for being sick.  (*Id.*)  As a result, they had to fire him.  (*Id.*)

- When he is depressed, all he wants to do is lay in bed.  (*Id.*)  Three times a week he just lays in bed while his wife cares for their daughter.  (*Id.*)  He does not always change his clothes and shower on those days.  (*Id.*)  He stopped playing his guitar, he had to sell his video games, and he has gained almost 100 pounds since May 2018.  (*Id.* at 47.)  His pills cause weight gain and he has been eating a lot more.  (*Id.* at 47-48.)

- When he is manic, he has difficulty concentrating and thinking.  (*Id.* at 48.)  He also cannot manage money well and will be overly aggressive.  (*Id.*)  He also does not sleep well, and often will be awake for three to four days without sleep.  (*Id.*)  He also does not take his pills as often as he should or 100% of the time during those periods.  (*Id.*)

- The last few times he has been admitted to the hospital it was because he was depressed.  (*Id.* at 49.)  His last big manic stage was in 2008.  (*Id.*)

The VE testified Butcher had past work as an assembler and retail attendant.  (*Id.* at 51.)  The ALJ then posed the following hypothetical question:

> Okay.  I'd like you to assume an individual who is 29 years old.  Excuse me, 30 years old.  Has three years of college and work experience to which you testified.  This individual does not have exertional limitations, but non-exertionally he can perform routine tasks in a low-stress environment.  No fast pace, strict quotas, or frequent duty changes.  Involving superficial, interpersonal interactions with coworkers and supervisors.  No arbitration, negotiation, or confrontation and no interaction with the general public as a job requirement.  Could this individual perform either of his past jobs?

(*Id.*)

The VE testified the hypothetical individual would not be able to perform Butcher's past work as an assembler or retail attendant.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaner, laborer-stores, and merchandise marker.  (*Id.* at 51-52.)

The ALJ then modified the hypothetical to include that because of symptoms, the hypothetical individual would be off-task at least 20% of the time.  (*Id.* at 53.)  The VE testified that would preclude any competitive work.  (*Id.*)

Butcher's counsel asked the VE whether a hypothetical individual being absent three or more days a month would affect any of the VE's testimony.  (*Id.*)  The VE testified absences at that level would preclude competitive work.  (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

16

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Butcher was insured on his alleged disability onset date, August 29, 2017, and remained insured through September 30, 2018, his date last insured ("DLI"). (Tr. 10.) Therefore, in order to be entitled to POD and DIB, Butcher must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.

2.   The claimant has not engaged in substantial gainful activity since August 24, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: bipolar disorder without psychosis, attention deficit hyperactivity disorder ("ADHD"), and Asperger's syndrome (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform routine tasks in a low stress environment (no fast paced, strict quotas, or frequent duty changes) involving superficial interpersonal interactions with co-workers and supervisors (no arbitration, negotiation, or confrontation), and no interaction with the general public as a job requirement (20 CFR 404.1569a and 416.969a).

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on January **, 1989 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

18

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 24, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-20.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject

19

to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

20

## VI.  ANALYSIS

**A.      First Assignment of Error**

Butcher raises several arguments in his first assignment of error.  First, Butcher argues the ALJ "disregarded" a work performance evaluation that set out the problems Butcher had while working, instead relying on the state agency reviewing psychologists' opinions.  (Doc. No. 16 at 12.)  Butcher asserts this was error as the ALJ's conclusions were not supported by substantial evidence.  (*Id.*)  Second, Butcher argues the ALJ "failed to take into consideration or mention" the fact that Butcher had been hospitalized several times.  (*Id.*)  Third, Butcher asserts the ALJ erred in finding he did not meet Listing 12.04, as the ALJ "cherry-picked" the evidence and "disregarded" facts supporting a disability finding. (*Id.* at 13.)  Fourth, Butcher argues the ALJ erroneously found that Butcher's ability to carry out some activities meant he was not disabled.  (*Id.*)  Fifth, Butcher asserts the ALJ erred when finding the opinions of the state agency reviewing psychologists persuasive, as they did not have the opportunity to review the entire file.  (*Id.* at 14-15.)  Sixth, Butcher argues the ALJ erred when he failed to consider the opinion of treating psychologist Dr. Alamir.  (*Id.* at 15-16.)

The Court will address each of these arguments in turn, consolidating the arguments as necessary for efficiency.

**1.      Step Three and RFC Analysis**

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a),

416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1520(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the

claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug.29, 2013)).

However, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner." *Lett*, 2015 WL 853425, at *16. *See also Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *17 (E.D. Mich. March 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.*, No. 1:12-CV-2313, 2013 WL 6634300, at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).

The record reflects Butcher argued that he met the requirements of Parts A and C of Listing 12.04 at the January 17, 2019 hearing before the ALJ. (Tr. 49.) At Step Two, the ALJ found that Butcher's bipolar disorder without psychosis, ADHD, and Asperger's syndrome constituted severe impairments. (*Id.* at 13.) At Step Three, the ALJ stated that he considered Listings 12.04, 12.10, and 12.11 and addressed the paragraph B and C criteria for those listings as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.10, and 12.11. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

23

In understanding, remembering, or applying information, the claimant has a mild limitation. In a work evaluation from the claimant's most recent employment, he receives unsatisfactory ratings in judgment and analytical ability. (Ex. 1E). It is specifically noted that he struggles with packaging/shipping instructions when not under direct supervision. (Ex. 1E). It is also noted that the claimant does not correctly follow safety procedures. (Ex. 1E). However, it is also noted that the claimant is consistent with assigned tasks such as emptying the trash and keeping his work area clear for forklift operation. (Ex. 1E).

In interacting with others, the claimant has a moderate limitation. He alleges that he finds it hard to get along with others and becomes easily agitated at his supervisors. (Ex. 4E, Pages 1 and 6). In a work evaluation from the claimant's most recent employment, it is noted that the claimant makes poor judgments in personal behavior and relationships with co-workers. (Ex. 1E). It is further noted that the claimant has trouble interpreting tone, understanding body language, and understanding social cues. (Ex. 1E). However, during recent examinations, it was observed that the claimant has become more interactive and engaging with others after taking the medication Lexapro. (Ex. 1F, Page 7). The claimant has also been observed providing support to fellow group members during psychiatric treatment. (Ex. 12F, Page 36). Deryck Richardson, Ph.D. and Courtney Zeune, Psy.D., State DDS psychologists, opine that the claimant is moderately limited in interacting appropriate [sic] with the general public, accepting instructions, responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Ex. 1A, Ex. 4A).

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. He alleges that he has difficult [sic] completing tasks and concentrating. (Ex. 4E, Page 6). In a work evaluation from the claimant's most recent employment, it was noted that the claimant requires constant supervision and reminders not to waste time and to focus on tasks. (Ex. 1E). It is also noted that the claimant's workload has been reduced to no longer include more complicated or multi-step tasks due to his difficulty with focusing. (Ex. 1E). However, during recent examinations, it was observed that the claimant's concentration and motivation has improved after taking the medication Lexapro. (Ex. 1F, Page 7). The record also reflects that the claimant has often exhibited no signs of attentional or hyperactive difficulties during examinations. (Ex. 1F, Page 7; Ex. 3F, Page 4; Ex. 6F, Page 3). Courtney Zeune, Psy.D., a State DDS psychologist, opines that the claimant is moderately limited in his ability to maintain concentration and attention for extended periods. (Ex. 5A). She also opines that he is moderately limited in the ability to complete a normal workday without interruptions from psychologically based symptoms. (Ex. 5A).

As for adapting or managing oneself, the claimant has experienced a moderate limitation. He alleges that he occasionally forgets to shower. (Ex. 4E, Page 2). He testified at the hearing that due to his depression, he has gained significant weight and will stay in bed up to 2-3 times in a week. In a work evaluation from

the claimant's most recent employment, it is noted that the claimant has failed to follow shop safety procedures and has been injured as a result.  (Ex. 1E). However, it is noted that he keeps his work area clean and organized.  (Ex. 1E). During examinations, the claimant has appeared either casually groomed or well-groomed and dressed.  (Ex. 1F, Page 7).  The claimant also reported that he was taking better care of himself after taking Lexapro.  (Ex. 7F, Page 24).  Deryck Richardson, Ph.D. and Courtney Zeune, Psy.D., State DDS psychologists, opine that the claimant is moderately limited in responding appropriately to changes in the work setting.  (Ex. 1A; Ex. 5A).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria of Listing 12.04.  A careful examination of the record evidence shows no history of a mental impairment that is "serious and persistent," that is a medically documented history of the existence of the disorder over a period of at least 2 years, and there is no evidence of (1) medical evidence, mental health therapy, psychological supports, or a highly structured settings that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder and (2) marginal adjustment, that results in minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

(*Id.* at 13-14.)

In his analysis of the paragraph B criteria, the ALJ cited only three records after 2017.  The record the ALJ continually relied on that Butcher was doing better after taking Lexapro is from early August 2017, preceding the physical altercation with his sister and his two hospitalizations in 2018.  (*Id.*)  The ALJ cited a single page from May 2018 treatment records for the proposition that Butcher was taking better care of himself after taking Lexapro, except the cited page – a single page from Butcher's inpatient hospitalization admission form – does not say that.  (*Id.* at 14.)  The ALJ failed to mention any of Butcher's three in-patient hospitalizations in the record in his Step Three analysis, including a 20 day inpatient stay in May 2018, as well as Butcher's subsequent participation in a partial hospitalization program, consisting of five to six hours of therapy a day, and an IOP.  (*Id.* at 13-15.)  In addition, the ALJ largely ignored the negative findings in the mental health treatment records.  (*Id.*)  For example, while the

25

ALJ cited to a positive finding in the 2018 IOP discharge summary, he ignored the negative comments on the same page. (*Id.* at 14.)

Nor can reading the decision as a whole save the deficiencies in the ALJ's Step Three analysis, as in the RFC analysis the ALJ glossed over the hospitalizations and Butcher's participation in the partial hospitalization program and IOP by labeling them "treatment." (*Id.* at 15-18.) In a single paragraph concerning Butcher's bipolar disorder, the ALJ stated as follows:

> The claimant has been diagnosed with bipolar disorder. (Ex. 2F, Page 2; Ex. 3F, Page 4; Ex. 5F, Page 1). He reports a loss of interest in activities and hobbies that he used to enjoy. (Ex. 1F, Page 78). However, he has consistently denied hallucinations, delusions, or symptoms of psychotic process. (Ex. 1F, Page 7; Ex. 3F, Page 4; Ex. 6F, Page 6). After beginning to take the medication Lexapro in August 2017, the claimant noted significant improvement and reduced crying spells. (Ex. 1F, Page 7). He also reported generally feeling better and denied any major problems. (Ex. 3F, Page 4). In both November 2017 and February 2018, the claimant's bipolar disorder was evaluated as in full remission, with the claimant reporting that he was feeling good and experiencing only mild depression. (Ex. 3F). However, at the end of February 2018, the claimant presented to the emergency room in a manic phase and alleged thoughts of self-harm. (Ex. 7F, Pages 7 and 60). The record demonstrates periodic bouts of treatment throughout 2018 for suicidal ideations, anger issues, and altercations with family members. (Ex. 9F, Page 1; Ex. 10F, Page 53; Ex. 12F, Page 36). Upon discharge from treatment, the claimant was observed to have better focus, better social interaction, and was attending to his activities of daily living. (Ex. 9F, Page 2). The claimant's history of depression and anger issues supports the about [sic] residual functional capacity that limits him to performing routine tasks in a low stress environment, involving superficial interactions with coworkers and supervisors, and no interaction with the general public.

(*Id.* at 16.)

The Commissioner argues that Butcher "misread" the ALJ's decision and is wrong to argue the ALJ did not consider or mention Butcher's hospitalizations because the ALJ "noted that Plaintiff went to the emergency room in 2018" and then cited the discharge summaries from his February 2018 and May 2018 hospitalizations. (Doc. No. 17 at 13.) Therefore, according to the Commissioner, "the ALJ acknowledged these hospitalizations." (*Id.*) While the Commissioner is correct that the ALJ mentioned his February 2018 emergency room visit, nowhere does the ALJ mention that Butcher was admitted for

three days.  (Tr. 16-18.)  Nor does he mention that just three months later, Butcher was hospitalized again, this time for 20 days, which was followed by participation in a 20-day partial hospitalization program consisting of five to six hours of therapy a day, which was then followed by participation in an IOP.  (*Id.*)  Even assuming the ALJ "acknowledged" this evidence, he failed to characterize the treatment records properly and he failed to *analyze* this evidence.

In addition to reducing several hundred pages of medical records to three paragraphs, the ALJ continued to cherry-pick the evidence in the RFC analysis, focusing on the positive findings while ignoring the ones supportive of disability.  (*Id.* at 16-18.)  As explained in detail above, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996).  Likewise, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence.  *Shrader*, 2012 WL 5383120, at *6.  Finally, an ALJ may not overlook or ignore contrary lines of evidence.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec.

27

13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Therefore, the undersigned recommends the Court vacate the ALJ's decision and remand for proper consideration, articulation, and analysis of the medical records at Step Three and in the RFC analysis.

### 2.  Opinion Evidence

#### a.  Dr. Alamir

Since Butcher's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ provided the following articulation regarding Dr. Alamir's opinion: "The undersigned finds that the opinion of Samar Alamir, M.D., a treating physician, is not persuasive.  (Ex. 16F).  Dr. Alamir's opinion is a 'checklist' style opinion, which provides no explanation for his findings or references to any specific medical findings.  Therefore, the undersigned finds it is not persuasive."  (Tr. 17.)

The hearing transcript reveals the following exchange between Butcher's counsel at the administrative level and the ALJ:

ALJ:    Okay. Let's see here. Normally I would reject this evidence, this most recent report from Dr. Alamar.

ATTY:   Yes.

ALJ:    He prepared it on November 17th; it was submitted yesterday.

ATTY:   I know. I have –

ALJ:    Normally I would reject it.

ATTY:   Okay. So you don't want my long story?

ALJ:    I'm going to admit it, but I'm going to tell you, you know what weight I give to checklist opinions.

ATTY:   Right. I mean, I can address that if you want.

ALJ:    You can address it, but you know what weight I give to checklist opinions.

30

ATTY:      Sure. I mean –

ALJ:       I mean, a doctor is not going to go tick, tick, tick, oh, he's disabled. That's not how I operate.

ATTY:      Right.

ALJ:       So if that's all they're going to give you, don't bother to submit it.

ATTY:      That was actually submitted to DDS, as you can see.

ALJ:       Yeah, okay.

ATTY:      But it didn't –

ALJ:       DDS didn't accept it, either.

ATTY:      Last night I got into the file and I had a mini heart attack when I saw it wasn't in there.  So that's why I submitted it myself to you last night.

ALJ:       Well, I'm admitting it, but –

ATTY:      That's why I put the cover page and everything on it.

ALJ:       In accordance with the revised opinion standards set forth in 404.1520(c) and 460.2920(c) I find that it is not supported by, nor consistent with, the objective medical evidence and I am therefore rejecting that medical opinion.

ATTY:      You don't think it's supported?

ALJ:       I'm rejecting it because it's a checklist.

ATTY:      Okay.

ALJ:       I don't care for checklists.

ATTY:      Okay.

ALJ:       If a doctor doesn't care enough about his patient to write a narrative report about it and just say well dit, dit, dit, well no, I'm not going to deal with it.

ATTY:      I think he cares a lot about our patient.  We provided him the form.

ALJ:       Okay. Well –

ATTY:      It's hard for us to get letters on these cases,

ALJ:      I know it is, but I do not care for checklists.

ATTY:     But I think it is supported.  I mean, I get the checklist thing, I'm not going to arguing [sic] that now.

ALJ:      Yeah.

ATTY:     But in terms of supportability, my client has been admitted – you know, during the record, you can see in 2018 twice.  He went through partial hospitalization.  He's got a pretty good work record here as someone trying, but he's been –

ALJ:      I find no vocational relevant past work, Counsel.

ATTY:     Okay. I mean, still he's trying to work and he's going to testify but I think that you have –

ALJ:      He can testify.  I'm admitting it in the record, but I do not care for checklist opinions, which is – I just don't.

ATTY:     Okay. Do you see –

ALJ:      Not just from you; from anybody.

ATTY:     No, I get it.  Do you see any of the listings in play here?

ALJ:      I will address that in my decision.

ATTY:     Okay.  Nothing that you want to discuss with me?

ALJ:      Not right now, no.

(Tr. 35-37.)

The Court finds the ALJ erred in his evaluation of Dr. Alamir's opinion by failing to address consistency and supportability, the two most important regulatory factors, in his opinion.  As the Commissioner admits, while the ALJ stated at the hearing he found Dr. Alamir's opinion inconsistent and unsupported, those findings should have been included in the ALJ's decision.  (Doc. No. 17 at 16 n.4) (citing 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)).  However, the Commissioner argues this error is harmless, as Butcher cannot show harm, as is his burden, because the ALJ discussed the findings at the

hearing.[5]  But the above-cited portion of the transcript shows no articulation to support those findings beyond the ALJ's dislike of checklist opinions.  The ALJ failed to respond at the hearing to counsel's argument that, checklist opinion notwithstanding, Dr. Alamir's opinion was supported by the record, including Butcher's hospitalizations.  Therefore, the undersigned cannot say the ALJ's error was harmless.

As the undersigned recommends this matter be remanded for errors at Step Three and elsewhere in the RFC analysis, on remand the ALJ should properly articulate the findings regarding Dr. Alamir's opinion in the decision.

### b.    State agency reviewing psychologists

In his initial brief, Butcher argues the ALJ erred in finding the opinions of the state agency reviewing psychologists' opinions persuasive as they did not have the opportunity to review the entire file, and it was after their review that Butcher was hospitalized twice.  (Doc. No. 16 at 14-15.)  However, in the RFC analysis, the ALJ recognized that there were medical records after the state agency reviewing psychologists' opinions that "demonstrate[d] ongoing psychological problems and the need for continued treatment."  (Tr. 17.)  The ALJ then stated the RFC was more restrictive than the state agency reviewing psychologists' opinions as a result.  (*Id.*)

In his reply brief, for the first time, Butcher argued the assigned RFC actually was not more restrictive because the ALJ failed to include the limitations that Butcher could perform tasks in a work setting that did not require close, sustained attention to detail, that he was likely to have problems with coworkers or supervisors, and that he would have increased symptomology if he became stressed from work.  (Doc. No. 18 at 3.)

---

[5] The Commissioner further argues Butcher waived any argument regarding the ALJ's failure to include the consistency finding in the decision by not arguing the ALJ erred in that regard.  (Doc. No. 17 at 16 n.4.)  The undersigned disagrees.  Butcher argued that the ALJ failed to review Dr. Alamir's opinion and that "the ALJ committed harmful and reversible error" when stating he would not consider Dr. Alamir's opinion.  (Doc. No. 16 at 16.)

The Court will not address arguments raised for the first time in a Reply Brief. As another court within this District has explained:

> It is well-established that a party should not raise new arguments in a reply brief. *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008). A reply brief provides a plaintiff the opportunity to respond to arguments raised for the first time in the defendant's brief. But, the plaintiff cannot wait until its reply brief to assert new arguments because such a practice would effectively deprive the defendant of the opportunity to expose weaknesses in the plaintiff's arguments. *Id.* "These waiver and forfeiture rules ensure fair and even-handed litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute." *Winnett v. Caterpillar,* Inc., 553 F.3d 1000, 1007 (6th Cir. 2009). District courts in this circuit have applied this doctrine in Social Security cases. *E.g. Caley v. Astrue,* No. 5:11–CV–1146, 2012 WL 1970250, at *15, n. 11 (N.D. Ohio June 1, 2012) (Vecchiarelli, J.); *Hamilton v. Comm'r of Soc. Sec.*, No. 1:09–CV–260, 2010 WL 1032646, at *6 (N.D. Ohio Mar.17, 2010) (White, J.); *Johnson v. Comm'r of Soc. Sec.*, No. 1:09–CV–967, 2011 WL 4954049, at *11 (W.D. Mich. Sept. 22, 2011).

*Bender v. Comm'r of Soc. Sec.*, 2012 WL 3913094, at *8 (N.D. Ohio Aug.17, 2012). *See also Daniels v. Colvin*, 2015 WL 4394412, at *18 (N.D. Ohio July 16, 2015).  Because Butcher failed to challenge the ALJ's decision on this basis in his Brief on the Merits, the Court deems this argument waived and will not address it herein.  However, as the undersigned recommends this matter be remanded for the reasons set forth above, on remand the ALJ will have the opportunity to consider the state agency reviewing psychologists' opinions and the evidence post-dating their review in formulating the RFC.

**B.  Second Assignment of Error**

In his second assignment of error, Butcher argues the ALJ committed harmful error in his subjective symptom analysis.  (Doc. No. 16 at 19-21.)  Butcher asserts that his testimony was supported by his work performance evaluation, as well as his hospitalizations, which were not addressed by the ALJ.  (*Id.* at 21.)  The Commissioner responds that substantial evidence supports the ALJ's subjective symptom analysis.  (Doc. No. 17 at 19.)

34

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). *See also* SSR 16-3p,[6] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[7] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

---

[6] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the November 2, 2018 hearing.

[7] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[8] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

As the undersigned recommends this matter be remanded for errors at Step Three and in the RFC analysis, on remand the ALJ will have the opportunity to consider Butcher's subjective symptoms in formulating the RFC.

## C.     Third Assignment of Error

Part of Butcher's third assignment of error is tied to his previous arguments, as Butcher asserts the ALJ failed to meet his Step Five burden because the ALJ disregarded any evidence, objective or subjective, that would have supported a disability finding. (Doc. No. 16 at 21.) Butcher then "notes" that the ALJ denied his administrative level attorney's request for a supplemental hearing or that interrogatories should be issued because counsel did not object to the vocational witness. (*Id.* at 23.) Butcher argues the ALJ failed to address the request for supplemental hearing or the request for

---

[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

interrogatories.  (*Id.*)  The Commissioner responds that the ALJ appropriately relied on the VE's testimony.  (Doc. No. 17 at 20-22.)

As the undersigned recommends this matter be remanded for errors at Step Three and in the RFC analysis, which may impact any Step Five findings, the undersigned does not address the merits of Butcher's arguments regarding the VE's testimony.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: May 3, 2021                                     *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**